UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                            :
UNITED NATURAL FOODS, INC.,                 :      05 Civ. 5512 (RJH)
                                            :
                       Plaintiff,           :
                                            :      **MEMORANDUM
          - against -                       :      OPINION AND ORDER**
                                            :
HELENE BURGESS,                             :
                                            :
                       Defendant.           :
                                            :
------------------------------------------------------------x
```

In this diversity action, plaintiff, United Natural Foods, sues defendant Helene Burgess for breach of contract. Plaintiff's claim arises out of Burgess's personal guaranties of payment on future invoices for goods shipped by plaintiff to two Healthy Pleasures grocery stores previously owned by Burgess. Burgess moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the complaint. She argues that neither her nor her authorized agent signed the guaranties, that the guaranties were not signed in a personal capacity, and that the guaranties were discharged by an alteration of the obligations of the stores. For the reasons that follow, Burgess's motion is GRANTED.

## BACKGROUND

Until November 2003, Burgess owned three Healthy Pleasures grocery stores (each separately incorporated as "93 University Place Corp.," "489 Broome Street Corp.," and "2493 Broadway Corp." and discussed hereinafter as the "University Place store," the "Broome Street store," and the "Broadway store,"). (Burgess Decl. ¶ 2.)

While each store was named Healthy Pleasures, all three stores were separately incorporated and separately responsible for their own obligations.  (*Id.*; Anesta Tr. 96:16–98:5.)  Plaintiff is a distributor of natural foods and related products.  In May 1998, plaintiff faxed "Credit Applications" containing personal guaranty language to the University Place and Broome Street stores (together, the "guaranteed stores").  (Ramdass Tr. 28:10–13.)  These applications were filled out with Burgess's name, social security number, address, phone number, and purported signature, and returned to plaintiff.  (Weiss Decl. Exs. 4, 5.)  The credit application for the Broadway store, which opened later, was executed in December 2001 and signed by Bashar Omar, who was then its manager.  (Weiss Decl. Ex. 6.)

Immediately preceding the signature line of each credit application are two paragraphs.  The first reads in part:  "My/our signature attests financial responsibility, ability, and willingness to pay each invoice within the terms specified.  I/we agree to pay all collection costs incurred, including reasonable attorney fees, agency fees and court costs, in the event this account is referred for collection. I, the undersigned, am authorized to bind my company for any and all credit under the terms of this application."  The second paragraph, under the heading "GUARANTY" reads:  "In order for United Natural Foods, Inc. to extend credit to the Credit Application supplied, and in consideration thereof, receipt which is hereby acknowledged, the undersigned jointly and severally guarantee payment on each invoice and the performance of all terms and conditions of this Credit Application.  This is a continuing guaranty and shall remain in full force until written notice of revocation is received and acknowledged by United Natural Foods, Inc."  The paragraph concludes with a line that reads "Executed by the

2

undersigned Guarantor(s) this _____ day of _____, 19___." This line is not filled in on either credit application for the guaranteed stores.

Directly below the execution line for the guaranteed stores' credit applications is a signature that reads "Helene Burgess" on the line designated "Customer Signature." Burgess contests the authenticity of the signature, and her former bookkeeper, Angela Ramdass, while not specifically recalling signing the credit applications, was "positively certain" that the handwriting was her own and not that of Burgess. (Burgess Decl. ¶ 3; Ramdass Tr. 36:11–37:22.) While plaintiff argues that it had no reason to question the authenticity of the signature, and that it would have "been highly unusual" for Burgess not to review the documents, it offers no evidence to suggest that the signature was in fact that of Helene Burgess. (*See* Pl.'s Rule 56.1 Statement ¶ 6.)

The parties further dispute whether Burgess had authorized the signing of the credit application. Burgess declared that she did not authorize Ramdass to sign her name to the personal guaranty. (Burgess Decl. ¶ 4.) However, Ramdass stated at her deposition that she knew the applications needed a signature because they needed a personal guaranty, that Burgess was aware she was signing her name to the documents, and that she was authorized to sign Burgess's name to the documents. (Ramdass Tr. 28:19–24, 41:4–12, 42:23–44:2.) Further, plaintiff contends that Burgess routinely instructed or authorized Healthy Pleasures employees to fill out and sign business and personal documents, even in her presence. (*See* Pl.'s Rule 56.1 Statement ¶¶ 9, 10.)

Pursuant to the credit agreements, plaintiff provided natural foods and related products to the Healthy Pleasures stores from 1998 through 2001, when the Broadway store opened, until 2003. During that period, the stores frequently failed to timely pay for

3

the delivered goods. (Brahman Decl. ¶ 11.) By mid-2003, the three stores collectively owed plaintiff over two million dollars for goods delivered but not paid for. (Omar Decl. ¶ 4.) In the late summer and early fall of 2003, plaintiff threatened to sue all the stores for the unpaid balances, and discussions began as to extending the payment terms of the debt. (*Id.* ¶ 8.) On November 5, 2003, Burgess sold all her shares in the three stores to Omar. (Burgess Decl. ¶ 2.) Shortly thereafter, Omar closed the Broadway store because of a severely negative cash flow. By December 2003, plaintiff cut off shipments to the remaining stores due to the defaults on payment obligations, and only resumed shipping on the condition that plaintiff receive a certified check before it delivered goods. Negotiations about reforming the obligations of the stores continued in the hopes of keeping the remaining stores in business and avoiding litigation. Plaintiff sought a personal guaranty from Burgess as a precondition for altering the terms of the stores' obligations; Burgess repeatedly refused. (Townsend Tr. 78:9–13; Brahman Tr. 109–13.) Eventually, in January 2004, with Burgess's guaranty, plaintiff, Omar, and the three stores entered into a settlement agreement ("the Agreement"). (Weiss Decl. Ex. 10; Brahman Decl. ¶ 20.)

   Pursuant to the Agreement, the debts of the three stores were consolidated into a single note (the "Note") for which each would be jointly and severally liable. It further provided that all payments received under that note would first be used to pay off the debt of the Broadway store, which had no positive cash flow as it had closed. Plaintiff never sought, nor obtained, Burgess's consent to any of the terms of the Agreement or note. (Burgess Decl. ¶ 5; Brahman Tr. 143:6–8.) The note, secured by an interest in the three stores, set forth terms of payment under which plaintiff would receive over two million

4

dollars over the course of more than ten years. (Weiss Decl. Exs. 10, 11, 12.) However, the remaining two stores closed shortly after the Agreement was signed (due in part to the opening of a Whole Foods store nearby), with only a small fraction of the outstanding debt having been paid. (Brahman Decl. ¶ 22.) In June 2005, plaintiff brought suit against Burgess to recover for the obligations of the guaranteed stores.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. *Am. Cas. Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994); see *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party must demonstrate that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).

If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); Celotex, 477 U.S. at 322–23. An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory

statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. See *id.* at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

## DISCUSSION

Burgess makes three independent arguments to support her motion for summary judgment: (1) neither her nor an authorized agent signed the credit application; (2) the application was not signed in a personal capacity; and (3) the Agreement discharged the guaranty of payments on the invoices of the guaranteed stores. While the Court finds a genuine issue of material fact exists as to the first two defenses, there is no genuine issue as to whether the guaranties on the original debts were discharged by the Agreement and did not cover the new debts incurred thereby.

### I.     Authorization of the Signature

Under the New York statute of frauds, every promise to answer for the debt of another must be signed by the party to be charged, or his or her lawful agent. *See* N.Y. Gen. Oblig. Law §5-701 (McKinney 2006). Plaintiff offers no evidence to refute that it is not Burgess's, but Ramdass's signature on the credit application, so the Court must inquire whether Ramdass was authorized to do so. The only evidence offered by Burgess that Ramdass was not authorized is her own self-serving declaration. (*See* Burgess Decl. ¶ 4.) Even if this satisfied her initial burden on summary judgment, Ramdass testified that she believed she was authorized to sign Burgess's name to the document. (Ramdass 43:18–21.) Ramdass's testimony is supported by circumstantial evidence: Burgess often spent more than ten hours a day, seven hours a week, in the University Place store working just a few feet away from Ramdass and she was intimately involved in decisions

6

regarding financial arrangements with vendors (Omar Decl. ¶¶ 2, 17; Ramdass 22:23–23:10.)  Accordingly, there is a genuine issue of material fact on the issue of authorization.

## II. Intent to Be Individually Bound

Burgess next argues that as an agent for the guaranteed stores, her signature did not bind her in her personal capacity.  "Under New York law, an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'"  *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991) (quoting *Mencher v. Weiss*, 306 N.Y. 1, 4, 114 N.E.2d 177 (1953)).  The Court will consider a number of factors in making this determination, including: "the length of the contract, the location of the liability provision(s) in relation to the signature line, the presence of the signatory's name in the agreement itself, the nature of the negotiations leading to the contract, and the signatory's role in the corporation."  *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994).

The Court finds a genuine issue of material fact as to whether Burgess's name was signed with the intent that Burgess be individually bound.  A number of the *Lollo* factors weigh in plaintiff's favor.  The contract was only one page.  The personal guaranty provision is located immediately above the signature line.  This is certainly no "trap for an unwary agent."  *Paribas Properties, Inc. v. Benson*, 536 N.Y.S.2d 1007, 1009 (N.Y. App. Div. 1989).  Burgess was the president and sole shareholder of the two corporations owning the University Place and Broome Street stores.  Her name was typed

into the contract earlier on the page. Her signature was not followed by any handwritten notation indicating that the signature was only in an official capacity, but is rather followed by her *home* address and telephone number. Furthermore, Ramdass, who signed the credit agreement, understood that a signature was needed because plaintiff "needed a personal guaranty." (Ramdass Tr. 28:24.)

  Not all evidence points toward an intent to be individually bound. Burgess makes much of the fact that the blanks for the date in the final sentence of the guaranty paragraph are not filled in (although the application is dated immediately below, to the right of the signature). This provides some evidence that the signature below was not intended to bind Burgess in her individual capacity, but it is not by itself sufficient to outweigh all the evidence to the contrary. *See Gerald Syndicate v. Negev Home Made Foods*, 603 N.Y.S.2d 843 (N.Y. App. Div. 1993) (finding genuine issue where corporation's president had initialed thirteenth page of contract, which contained guaranty with president's name typed in, but had not signed signature line immediately following individual guaranty provision). In addition, below the line on which Burgess's signature appears is the typewritten notation "Customer," presumably referring to the stores for which credit was sought and not Burgess individually. Again, however, this is not dispositive and indeed, if the Court were to find that it was, every guaranty in plaintiff's credit applications would be invalidated as the boilerplate notation appears in all of them. So that intent to be personally bound would be unambiguous, it is better practice to have an "officer sign[] twice—once as an officer and again as an individual." *Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 67 (N.Y. 1961). Without two signatures, however, the Court finds a genuine issue of material fact as to intent.

### III. Alteration of the Underlying Contract

#### A. Applicable Law

As a general principal of New York law, any alteration of the terms of an underlying contract, for whose performance a guarantor is bound, and without the guarantor's consent, will release the guarantor from his or her obligations. *See White Rose Food v. Saleh*, 788 N.E.2d 602, 603 (N.Y. 2003); 63 N.Y. Jur. 2d *Guaranty and Suretyship* § 193 (2006). "An obligation is altered when the debtor is discharged from the original contract and a new contract is substituted in its place. The test is whether there is a new contract which will be enforced by the courts." *Bier Pension Plan Trust v. Estate of Schneierson*, 545 N.E.2d 1212, 1213 (N.Y. 1989). In such a case, "the principal is no longer bound to perform the obligation guaranteed," so the guarantor likewise cannot be "held responsible for the failure of the principal to perform." *Becker v. Faber*, 19 N.E.2d 997, 998 (N.Y. 1939). The Court will not inquire into whether the alteration was material or not, and whether it worked injury on the guarantor. *See id.* at 999. Such changes may include: the extension of time in which to pay a debt, if the extension is an enforceable agreement superseding the original debt and not merely leniency by the creditor, *see Bier Pension Plan Trust*, 545 N.E.2d at 1215; *Becker*, 19 N.E.2d at 999; a change in the contract price, *see Grant v. Smith*, 46 N.Y. 93, 97–98 (1871); modification of the loan terms, such as reducing loan collateral, *see Cent. Fed. S&L Ass'n v. Pergolis*, 570 N.Y.S.2d 170, 172 (N.Y. App. Div. 1991); or a change in the parties to the principal contract, *see* 63 N.Y. Jur. *Guaranty and Suretyship* § 273 (2006) ("Unless the surety assents thereto . . ., where a surety has undertaken responsibility for the performance of a

9

particular individual as principal, the surety cannot be held liable for the acts or obligations of another.").

In limited instances, an alteration without the guarantor's consent may not discharge the guarantor where the creditor expressly reserves his or her rights against the guarantor.  The general principal underlying such permitted alterations is that the creditor is only covenanting not to sue on the original obligation, leaving the guarantor free to perform on the principal's contract and become subrogated to the rights of the creditor. For example, where a creditor reserves its rights in extending the time for payment of a loan, a guarantor can pay off the loan as it becomes due and then seek payment from the debtor under the terms of the original loan.  *See* 63 N.Y. Jur. 2d *Guaranty and Suretyship* § 227 (2006).  Similarly, where a debtor agrees to a reservation of rights when a creditor releases its obligations, the "release" will be regarded only as a covenant not to sue and will not impair the subrogated rights of the guarantor against the debtor.  *See* 63 N.Y. Jur. *Guaranty and Suretyship* § 256 ("[T]he release of a principal debtor without the surety's consent does not discharge the surety if the creditor reserves his or her rights against the surety . . . because where such a reservation is made the apparent release is not absolute."); *Jones v. Gelles*, 562 N.Y.S.2d 992, 993–994 (N.Y. App. Div. 1990); *Standard Brands, Inc. v. Straile*, 260 N.Y.S.2d 913, 917 (N.Y. App. Div. 1965); *Meyn v. Schutte*, 186 N.Y.S.2d 965, 968 (N.Y. Sup. Ct. 1959) ("A release with reservations is regarded as a personal covenant not to sue the debtor, but leaves unimpaired the creditor's rights against the surety and his subrogation rights in turn against the debtor.").

Finally, an alteration to the underlying contract, even if material, prejudicial and done without the guarantor's knowledge, will not release a guarantor where the language

of the guaranty anticipates and consents to such modifications.  That is, "a guarantor's advance consent to modifications [of the underlying contract] is valid and enforceable." *Crossland Fed. Sav. Bank v. A. Suna & Co., Inc.*, 935 F. Supp. 184, 200 (E.D.N.Y. 1996) (principal's liability "may, from time to time, in whole or in part, be increased, renewed, extended, modified, amended, compromised or released"); *see also Bank of New York v. CMS Funding, Ltd.*, 608 N.Y.S.2d 476, 477 (N.Y. App. Div. 1994) (principal's obligation "may, from time to time, in whole or in part, be renewed, extended, modified, accelerated, compromised, settled or released"); *Republic Nat'l Bank of New York v. Haddad*, 504 N.Y.S.2d 669, 671 (N.Y. App. Div. 1986) (same).

### B. Application

The underlying contracts to which the guaranties at issue in this case apply are the invoices between plaintiff and the individual store for the delivery of groceries.  (*See* Weiss Decl. Exs. 4, 5 ("[T]he undersigned jointly and severally guarantee payment on each invoice.").)  The terms of payment under these guaranteed invoices ranged from "COD" to a maximum of thirty days.  (Darigan Decl. ¶ 3.)  The principal parties to these invoices are plaintiff and each individual store, themselves separate corporations which were invoiced separately and responsible only for payment of the store's own invoices. (Anesta Tr. 96:16–98:5.)  In other words, Burgess guaranteed that the University Place and Broome Street stores would make payment on their respective obligations under the individual invoices.

The Agreement altered the obligations of these stores to plaintiff.  First, the Agreement states that the three stores owe plaintiff a total of $2,259,272.47 for which the three stores "have agreed to be jointly and severally liable." (Weiss Decl. Ex. 10.)  Thus,

11

while the guaranteed stores were only liable for their own past invoices under the credit applications, the Agreement made them legally liable for the additional debts of the other two stores.  Indeed, the Agreement does not even identify the individual obligations of each of the three stores.  Second, all payments received under the Note from either of the two guaranteed stores were first to be applied to pay off the debts of the Broadway store.[1]  (*Id.* ¶ 7.)  Accordingly, payments made to plaintiff by either guaranteed store would not go to paying off debt under their original invoices (at least until the debt of the Broadway store was paid off).  Finally, the Agreement extended the time in which the stores could pay off its debts from under thirty days to a period exceeding ten years.  The note makes clear that this was not simply leniency shown by a creditor, but was a new enforceable obligation that superseded the creditor's rights under the past invoices.

The Court finds that these are significant modifications to the terms of the underlying invoices.  Indeed, the obligations under the past invoices were not only altered, which itself can discharge a guarantor, but the Note appears to have legally replaced the invoices as the operative debt instrument.  The Agreement provides that it and the Note "supersedes all prior agreements, oral or written, regarding the subject matter hereof."  (*Id.*)  The invoices, as contracts of indebtedness of the three stores to plaintiff, appear to fit comfortably within the subject matter referred to.  (*See* Townsend Tr. 119:12–18 ("My understanding would be [the Note] would supersede the invoices.").)  The stores were no longer responsible for payment on the invoices, and could assert the Note as a defense should plaintiff attempt to sue them for defaulting on the invoices.  Burgess similarly may point to the Settlement Agreement to defend against being

---

[1] The apparent reason for this provision was the fact that the Broadway store had closed and would no longer be able to pay off its own debts.

12

required to perform under the guaranteed invoices. *See Bier Pension Plan Trust*, 545 N.E.2d at 1214 ("Obviously, if the debtor can assert a new contract in defense to an action on the original contract the surety may do so also."). Therefore, absent other arguments, Burgess's guaranties of the original invoice debts did not survive the modification of the obligations of the guaranteed stores.[2]

Plaintiff argues that the express reservation in the Agreement of its right to proceed against Burgess preserves the guaranties. *See* 63 N.Y. Jur. *Guaranty and Suretyship* § 256 ("[T]he release of a principal debtor without the surety's consent does not discharge the surety if the creditor reserves his or her rights against the surety.").[3] There is a clear tension between this principle of law and the general rule that where the "debtor is discharged from the original contract and a new contract is substituted in its place," the guarantor is released from her obligations. *Bier Pension Plan Trust*, 545 N.E.2d at 1213. However, the tension dissolves upon closer inspection. The effectiveness of a reservation of rights derives from its interpretation by courts as being only a covenant not to sue as opposed to a true release of the obligation, which as a matter of law would discharge the guarantor. *See Jones*, 562 N.Y.S.2d at 993–994. Thus, upon breach, a creditor would waive his right to sue the principal debtor, sue the guarantor under the still extant obligation, and the guarantor would in turn be subrogated

---

[2] Plaintiff does not argue, nor could it, that the guaranty expressly contemplates modification of the invoice debts. As noted *supra*, typical language for such a guaranty is as follows: principal's obligation "may, from time to time, in whole or in part, be renewed, extended, modified, accelerated, compromised, settled or released." *Bank of New York v. CMS Funding, Ltd.*, 608 N.Y.S.2d 476, 477 (N.Y. App. Div. 1994). Here, the guaranty did not contemplate the altering of the specific terms of the invoice obligations, let alone the extension of the debtor's obligations to include the obligations of sister stores.

[3] This section of New York Jurisprudence relies on N.Y. Gen. Oblig. § 15-104, which by its terms applies only to *co-obligors*, not to principal debtors and secondarily liable guarantors. At least one New York court has held in dicta that a reservation of rights against a party that is only secondarily liable for, as opposed to a co-obligor of, the principal debtor is ineffective. *See 801 South Fulton Ave. Corp. v. Radin*, 526 N.Y.S.2d 143, 144 (N.Y. App. Div. 1988). Because the Court finds that the reservation of rights is ineffective for other reasons, it is not necessary to decide whether the effectiveness of a reservation of rights is contingent on the third-party's status as primarily or secondarily liable on the obligation.

to the rights of the creditor against the debtor. On the other hand, where the debt is modified rather than released, even with an express reservation of rights, there is no presumption that the old obligation has not been truly replaced; rather the court must inquire into "whether there is a new contract which will be enforced by the courts." *Bier Pension Plan Trust*, 545 N.E.2d at 1213. If so, then the modification will have impaired the subrogated rights of the guarantor against the debtor, and as with a true release, the guarantor would be discharged.

As the Court found *supra*, the modification was not merely a covenant not to sue on the old obligation, but instead truly replaced it with a new obligation, such that the debtor can assert the new obligation as a defense against its enforcement by either the creditor or the subrogated guarantor. Like a true release of an obligation, this modification thus discharged Burgess regardless of the reservation of rights against her. Indeed, this must be the case. If Burgess continued to be liable on the original obligation, plaintiff could in theory proceed against both her on the original obligation and the guaranteed stores on the new obligation, potentially collecting twice. Moreover, plaintiff will have unilaterally impaired (indeed terminated) Burgess' subrogated right to proceed against the guaranteed stores, who could assert the new obligation as a defense. Therefore, the Court finds that the express reservation of the right to proceed against Burgess was ineffective and Burgess was discharged by the modification.

This outcome may appear distasteful, discouraging as it seems to businesslike efforts to work out new terms of existing debts, but it is dictated by New York law. By refusing to provide plaintiff with a guarantee of the new Note, Burgess forced it either to call in its debts and sue her and Omar for whatever it could recover on the guaranteed

14

invoices, or to restructure the debt without the benefit of the invoice guarantees, but on payment terms it hoped could eventually be satisfied. Without Burgess's consent, it chose the latter at its own peril. As the New York Court of Appeals recognized, surety law "when strictly applied at times produces results which do not accord with our sense of what is fair or desirable and which are, perhaps, not consistent with the realities of the business experience." *Becker*, 19 N.E.2d at 999. Such is the case here.

## IV. Continuing Guaranties

Plaintiff also argues that the guaranty is a "continuing guaranty," such that Burgess would be bound by the new obligations assumed by the guaranteed stores under the Agreement, even if the guaranty of their old debts did not survive the modification. This inquiry requires the Court to examine the guarantee itself, keeping in mind that guarantees are to "be interpreted in the strictest manner," *White Rose Food*, 788 N.E.2d at 603, and a "guarantor cannot be bound beyond the express terms of a guaranty," *Flexi-Van Leasing, Inc. v. Isaias*, 23 F. Supp. 2d 419, 422–23 (S.D.N.Y. 1998). A continuing guaranty covers obligations within its scope incurred after the guaranty is signed and survives modifications to existing obligations. A "continuing guaranty" survives a modification to old obligations because the "'new obligation' created by the modification, if independently incurred, . . . would . . . come within the scope of its coverage." *Trustco Bank New York v. Sage*, 656 N.Y.S.2d 542, 543 (N.Y. App. Div. 1997). The typical language of a continuing guaranty is broad, covering all indebtedness of the guaranteed party to the creditor "of every kind and character." *See id.*; *Chemical Bank v. Sepler*, 457 N.E.2d 714, 715 (N.Y. 1983) ("the undersigned hereby guarantees, absolutely and unconditionally, to the Bank the payment of all liabilities of the Borrower

15

to the Bank of whatever nature, whether now existing or hereafter incurred"); *USI Capital and Leasing v. Chertock*, 568 N.Y.S.2d 74, 75 (N.Y. App. Div. 1991) ("absolute, unconditional, continuing guaranty of payment . . . of all indebtedness and obligations of obligor to obligee of every kind and description . . . whether now or hereafter arising under the agreement or any other present or future agreement."). When the continuing guaranty is not "practically unlimited in its scope," however, it becomes necessary to inquire into whether the modified obligation falls within the scope of the continuing guaranty. *Bank of United States v. Chemical Bank & Trust Co.*, 246 N.Y.S. 595, 599 (N.Y. Sup. Ct. 1930).

Thus, the Court must decide whether the guaranty is continuing, and if so, whether the guaranteed stores' "new obligations" fall within the scope of the continuing guaranty. It is apparent from its language and effect that the guaranty is continuing to at least some extent. That is, it does not apply to a single past invoice or contract, but instead applies to any invoice debts incurred between plaintiff and the guaranteed store after the guaranty was signed and until it was revoked. Also by its terms, however, the guaranty is limited to "payment on each invoice." If the parties had merely extended the time in which payment was due on these invoices, even laying out a single payment plan for each individual store to provide for the payment of its past invoice debts, then a strong argument could be made that this new obligation is within the scope of the continuing guaranty. However, the Agreement did far more; the "new obligations" it imposed were fundamentally different from those covered by the guaranty and thus do not fall within its scope. It made each store jointly and severally liable for each other store and it provided for payments from both the University Place and Broome Street

stores to first go toward the debts of the Broadway store. These are terms that simply could not have been included in any new or modified invoice arguably within the scope of the continuing guaranty.[4]

Plaintiff could quite easily have drafted a broad continuing guaranty similar to those quoted above. It chose not to, perhaps because of concerns that customers would be unwilling to sign such an expansive personal guaranty. The Court will not question that business decision, but nor will it rewrite the guaranty to cover new obligations clearly not contemplated by the guarantor. Therefore, the Court finds that Burgess is not liable for the guaranteed stores' debt under the Settlement Agreement, as the guaranty did not survive the modification and the new obligations were outside the scope of the continuing guaranty.

## CONCLUSION

For the foregoing reasons, Burgess's motion for summary judgment [35] is GRANTED and plaintiff's Amended Complaint [15] is dismissed. The Clerk of the Court is directed to close the case.

SO ORDERED.

Dated: New York, New York
May 17, 2007

_____
Richard J. Holwell
United States District Judge

---

[4] Indeed, in seeking only sums owed by the guaranteed stores, plaintiff concedes that the guaranty is not a traditional continuing guaranty covering all indebtedness by the guaranteed party to the creditor. If it were, plaintiff would be entitled to recover for the entire "new obligation," which includes the debts of the Broadway store.

17